We'll move down to Appeal 25-2587, Ericka Mar v. Abbott Laboratories. And we'll begin with oral argument on behalf of the appellant, Mr. Rojas. May it please the Court, Counsel. The core errors below or error below was the District Court's failure to apply the Rule 56 principles that were articulated by this Court in Cloutier. That case, from Ms. Mar's perspective, controls the District Court. Rather than drawing reasonable inferences in plaintiff's favor, the Court resolved competing counterfactual inferences itself. The Court treated formula supplementation as inevitable, discounted evidence of alternative feeding pathways, and resolved competing counterfactuals. In Cloutier, this Court explained that determining what inferences from factual evidence are appropriate is a task which is quintessentially that of a jury. The Court was very clear that drawing legitimate inferences from facts are a jury function. But perhaps most important to this case, this Court expressly rejected the argument that counterfactual causation becomes legally insufficient merely because it involves uncertainty. The Court specifically considered the notion that when determining counterfactuals or counterfactual causation, there is necessarily some need for at least a limited amount of speculation, which I would assume is one of the concerns that this Court might have. But when we're dealing with counterfactuals, in other words, what might have happened if something else had earlier happened? What might have happened if a warning had been given? By definition, there is a certain amount of speculation that is requisite. The Court stated in Cloutier as follows, Our conclusions illustrate that we view what defendant calls speculation as part and parcel of what the jury's core function to determine what inferences to draw from the available evidence. In other words, the Court recognized that there was a certain level of speculation. The Court recognized that there's a need to decide competing inferences. But the Court ultimately decided that it was a jury, not a judge, that is in the best position to determine those competing inferences. Mr. Rojas, can I ask you a couple just preliminary questions? Yes, Your Honor. As the case comes to us, am I right that both parties agree that West Virginia law applies? Yes, Your Honor. No dispute about that at all? That's my understanding from this case. Okay. And what, if any, obligation was the plaintiff under with respect to the failure to warn? So the reason I'm asking that question is I understand your argument completely that the defendant failed with what it did provide as a warning. Are you under any other additional obligation to identify what a different or better or more sufficient or complete warning would have been? Or is your obligation just to say their warning was inadequate? What's West Virginia law tell us on that? Specifically, Your Honor, I'm not aware of anything in West Virginia law, nor did the District Court, to my recollection or knowledge, identify any specific need under West Virginia law to identify a specific. In other words, we don't have to, at the summary judgment stage, say this is the warning that should be given precisely. I think it's a matter of conviction. Do you have to, though, say that the defendant failed in its duty to warn in the following way? In other words, if you're alleging that there's a failure to warn, isn't embedded within that an obligation to explain what you mean, to describe what you mean? That the defendant did not adequately warn for this reason or that reason or on this point or that point? I think I understand the question, Your Honor. I think the fundamental premise of this litigation is that formula feeding significantly increases the risk of this deadly disease, necrotizing enterocolitis. That is the essence of the case. And so the implicit warning that we would be asking a jury to find what's necessary is quite simple. Formula feeding significantly increases the risk of necrotizing enterocolitis. And that's a warning that's never been given by this defendant. It's something that they've known for at least 50 years. And that's relevant, Your Honor, because the length by which they've known this means the warnings could have been given a very long time ago. Yeah, this is what I thought you would say, and it's kind of implicit in your brief. This is not trying to be a trick question or anything like that. If you're right about that, though, that that's the substance of the position that you took, what would that have told the treating physician, what's his name, Dr. Stephan Maxwell, that was different than what he already knew? We don't believe he knew the extent of the risk. His own statements suggest that. And that's where the sort of the competing evidence comes into effect, because certainly Abbott will point to evidence that suggests that he at least knew some quantum of risk associated with the use of the product. What we're saying is that he didn't know the significance of the risk. He didn't know that, indeed, it was significant. And so that's where we believe he and I can quote from some of his the things that he said. He acknowledged that he would have tried to get donor milk sooner if he knew the extent of the risk. He said that earlier knowledge of the neck risk could have helped fast forward those bureaucratic efforts. And although Abbott attempts to isolate Dr. Maxwell's later statement, the reality of it is his his earlier testimony during the plaintiff's examination of him suggests that he was someone who did not appreciate the full extent of the risk. Your Honor, I would also add his his conduct suggests that he wasn't fully appreciative of the extent of the risk because he's feeding an extraordinarily vulnerable baby something that is very dangerous and established very much in this record for a baby of that size and level of prematurity. I don't know if I've answered your question, but I'll proceed. Okay, so getting back to Cloutier, which I think is in essence what controls here, the jury in Cloutier was required to speculate, for example, about how physicians would act, how regulators would act, whether paperwork would move faster, whether the FAA approval would issue sooner, and whether altered conduct would ultimately change the outcome. Yet this court explained that whether Cloutier would have received FAA approval sooner was a genuine question of fact. And the court further held that a reasonable jury could have decided to credit that testimony and concluded that urging doctors to move faster would have moved the needle. So, Your Honors, the district court here improperly resolved competing inferences. The court effectively assumed that donor milk was unavailable, that formula had to be used, that no alternative feeding course would realistically occur, and that therefore a warning would not matter. But that is precisely the kind of inferential weighing that Cloutier forbids. One other point, the district court's opinion, I think, deemphasizes the importance of parental decision-making. As the court is aware, West Virginia law applies, and the learned intermediary doctrine is inapplicable here. And so Abbott had a duty to warn this parent. And this parent was someone who, like many of the parents that are afflicted by this terrible disease, are of limited education, many of them. Many are from challenged socioeconomic backgrounds. And a warning is particularly important to these folks because they don't know. They don't know of this risk. And here you had a mother who was literally trying to breastfeed to the point that her breast had become so irritated that her milk was coming out bloody. She would have tried harder to produce more milk, as she evidenced she was willing to do. That could have been an alternative source of feeding. She had a friend who was offering her own milk. Yes, a nurse at the hospital rejected that option, but that option was never brought to the attention of Dr. Maxwell. Why? Because there was a lack of appreciation of the gravity of the risk. And warnings matter precisely because decision-making is tied to information. And a parent has a right to know the risks that are associated with feeding decisions for their children. On the duty to warn parents, does West Virginia law presume that whatever warning is supplied, the parents, in fact, will read and become aware of the warning? Or alternatively, is there a need for evidence to show that the parents, in fact, saw the warning? The reason I ask that question is there's a little bit of ambiguity regarding the child's father here. Mr. Amar, it seems, at least saw the caps of the bottles. But it was far from clear to me in the papers whether he saw the label or looked at the label or acknowledged the label. What's the obligation with respect to, if any, parents seeing warning labels under West Virginia law? I am not aware of anything under West Virginia law that has a presumption that a parent would have seen a label if it had been there. So does that mean you have to come forward with evidence that they, like, for example, Mrs. Marr here, that she did see the label or would have seen the label? So, Your Honor, I'd respond in a couple ways. I think, one, the idea that a label is the only way that a company has to warn, I would reject that premise. This is a multinational corporation that advertises very aggressively to mothers while they're in pregnancy. That's in the record. And, yes, putting a label on a product is important. For one thing, it would probably encourage doctors to warn at a more aggressive level as a matter of policy. But beyond that, there were other ways to reach the mother. And, you know, they give out NICU pamphlets in the NICU. I do note that I have about three minutes left. Would you like to reserve the remainder of your time? Yes. Thank you, Your Honor. Thank you, Mr. Rojas. We'll now move to argument on behalf of the appellee, Ms. Koberly. Good morning, and may it please the Court.  This appeal is not about uncertainty or credibility determinations or competing inferences. It's simply about whether the plaintiff carried her burden of coming forward with evidence to establish that the warnings suggested by her would have led to changed behavior that would have avoided the injuries in this case. Now, a lot of what I just said, including the words establish and the warnings suggested by her and changed behavior and avoided the injuries, that's quoted directly from the jury instruction. The West Virginia Pattern Jury Instructions, Section 415, requires that the plaintiff establish that the warnings suggested by her would have led to changed behavior that would have avoided the injuries. The plaintiff here didn't come forward with that evidence. And that's not all. We presented evidence to the contrary. And that's what distinguishes this case from Cloutier. The evidence we presented was substantial. For example, we presented evidence that at this hospital, at this time, there was no other option to give to this infant once the mother's own milk ran low. Dr. Maxwell testified to that, and no other option was his words at pages 91 and 92 of his deposition transcript. We presented evidence that the hospital did not have a donor milk program at the time. That was actually undisputed, did not have a donor milk program at the time, is a quote from the plaintiff's own papers in the district court. We presented evidence that the hospital had a policy against using someone else's unpasteurized milk. And it wasn't just the nurse who said this. It was the treating physician as well who said, you know, we don't know the medical history of the person that's providing the milk. For all we know, she might have hepatitis or HIV or something else. We didn't practice that in our unit. This is pages 71 and 72 from his deposition. We also presented evidence from the AAP about why using unpasteurized milk is not recommended. And we presented evidence that the parents never saw or read the labels or packaging. The plaintiff herself admits that she did not see or read the labels or packaging. That was in her papers. And the father, whose testimony was presented only in the failed and untimely effort in the motion for reconsideration, he too testified that he did not see the labels or packaging. And I'll read specifically from, this is A27 of the record, the ruling rejecting the motion for reconsideration. Okay, sorry, I'll re-ask the question. Did you see any of the packaging or labeling for the formula that Ray Lee was administered? Answer, no specific labels or packaging. No. That's what drove the district court's analysis. This was an ordinary Rule 56 decision. It didn't require resolving competing inferences. It didn't require credibility determinations. It didn't require weighing the strength of any evidence. It was simply a straightforward decision based on what this court described in Osborne just last year. If the non-moving party will bear the burden of proof at trial. Does your position require you to ignore some of the statements by Dr. Maxwell that seem to go the other way? It does not, Your Honor. And so I would like you to specifically address his statements that, yes, we would have tried to get donor milk maybe quicker than we did, and that, you know, with information that the formula increases the risk, he answers yes to Mars Council's question, you could have used that information to fast-forward bureaucratic efforts. His statement that, yes, we would have been careful about using it if I was told a particular formula was associated with NEC, and then all his statements about, well, what if it said NEC, sure. So address those specific items. So I want to start with the passages that you highlighted, getting donor milk maybe quicker than we did in fast-forward bureaucratic efforts. Those are part of a whole passage that the court must read in its entirety, and I want to direct the court's attention to pages 25 and 26 of our response brief that recount that passage in its entirety. That testimony doesn't say that a warning would have made donor milk available, which was the burden that the plaintiff bore under West Virginia law and under that jury instruction I mentioned. In fact, Dr. Maxwell specifically said it would have taken too long. This whole passage starts with the premise, if you knew back in 2014, which is the very moment Ray Lee was born, that formula was, and then describing a warning that I will get back to in a second, Dr. Maxwell's response was it took five years. You have to go through the hospital, you have to go through the board and the foundation and all of this to get funding, to get donor milk. This is not something that happens overnight. So the gravamen of this passage, which the district court read in its entirety and went beyond the parts that were cherry-picked by the plaintiffs below, what he said was if he had learned new information in 2014, he would have tried to get donor milk maybe quicker but not in time for this infant. In fact, it took two more years after this for this hospital to get a donor milk program, and we know that from Dr. Shaw. So what he said was, and also he said, I'm not sure we had that opportunity at this time. So when you read this passage in its entirety, the question was designed, obviously, to get him to say could you have gotten donor milk, and his answer was no. His answer was it's not that easy, but you know it took us five years before we could get donor milk. So this passage, this testimony that the plaintiffs' entire appeal hinges on does not show that there would have been something else to feed Rayleigh Marr at the time. In fact, it was undisputed that donor milk was not available in this hospital at the time she needed it. There's another problem with that passage, and that is that the entire passage is about a warning that's different from the one that the plaintiff proposed here through the expert. Judge Pallmeyer found that the only specific warning identified by the plaintiff, suggested by the plaintiff, was human milk has a lower risk of neck than formula. That came from an expert named Scheer. Her conclusion on that issue is not challenged in this appeal. It's not mentioned in the opening brief at all, and it made a difference that this warning was different. The warning proposed by the question was if you knew back in 2014 that formula was the primary risk factor or significantly increased the risk of neck, would you have made efforts to get donor milk at that time? That's different from saying human milk has a lower risk of neck than formula, and it matters for two very specific reasons. First of all, Dr. Maxwell already knew that human milk has a lower risk of neck than formula. He was asked in 2011, were you aware that formula feeding is associated with higher risks of neck? Yes. And were you aware of it in 2014 when you treated Rayleigh Maher? Yes. We quote that at page 22 of our response brief. So it matters because the warning they have proposed is the very thing that Dr. Maxwell said he already knew. It also matters because the science wouldn't support the warning that is the premise of this passage from Dr. Maxwell's testimony. The primary risk factor, will plaintiff's own experts say that nothing outranks prematurity as the major risk factor for neck? Also, it says significantly increase the risk of neck. Well, significant depends on whether the risk was significant, depends on lots of things. Plaintiff's own expert, Dr. Dejour, says that the quantum of risk that any infant faces varies based on age and weight and proportion of human milk administered, and that's because human milk is protective against neck. Formula doesn't cause neck. Human milk is protective against neck. So the more human milk an infant receives, and the infant in this case got 95% of her diet in human milk, the impact of getting a tiny amount of formula is insignificant. In fact, there's no, as we've explained at the end of our brief, there's actually no evidence in this record that a 5% formula diet would be associated with any increase of risk at all. All this getting into arguments that Judge Palmer did not rule on our side with you, Warren, and do you need to go here? We do not, Your Honor. The reason I'm offering these comments is I'm trying to explain why it is that it matters that this entire passage from Dr. Maxwell is based on a theoretical warning that is different than the one the plaintiff has suggested to her expert in this case. And that's yet another reason why this passage from Dr. Maxwell about getting donor milk more quickly was not sufficient to carry her burden, particularly because even on the face of that passage, he is not saying he could have gotten donor milk in time. He's not saying that. What he's saying is he might have tried more quickly, but it still wouldn't have been in time for this infant, and that was the basis for Judge Palmer's ruling. Ms. Coverley, whenever there's a death involved, the question is often, what if? And I wonder if you might be able to speak to the record on this concept of pasteurization. It looks like there was this offer made, but then, of course, the nurse or the assistant indicated that wasn't going to be elevated to the doctor because there wasn't pasteurization of the friend or the other mother's milk. Is pasteurization machines – there's a lot of science in this case. Is a pasteurization machine common in a hospital for something like that? No. Pasteurization is something that happens in a donor milk bank. So there are today many donor milk banks. In fact, that's where hospitals get donor milk, typically. They do not do this concept of informal milk sharing where one mother just brings in milk and says, hey, use this. Hospitals aren't equipped to pasteurize donor milk. What happens is milk is provided to a milk bank, an accredited milk bank, which has equipment and handling and all of these things. That's how it's pasteurized. So there's absolutely no evidence in this record to suggest that somehow this hospital or Dr. Maxwell or the nurses could themselves have pasteurized the milk. That's just not – that's fanciful. And pasteurization matters because it eliminates some of these risks. That's why the AAP is so clear about recommending pasteurized donor milk. And we presented evidence on supporting that fact as well. We presented a number of different statements by the AAP talking about how pasteurized donor milk is the second best thing. Best thing is mother's own milk. Second best thing is pasteurized donor milk, which was not available at this hospital. Third best thing, if it's necessary, is formula. And that's always been the case. That is the practice. That was the practice in this hospital. It's just that in the middle they didn't have access to pasteurized donor milk because a donor milk program had not been established. And for all the reasons Dr. Maxwell explained, you don't just overnight create a donor milk program. You have to have special handling facilities. You have to have special training. You have to have special funding. It takes a while to do it. And we presented evidence as to why that takes so long and why it's so complicated. And that is evidence that the other side did not controvert. Instead of acknowledging that evidence in the reply brief here, for example, they simply repeated the excerpts, the cherry-picked quotes from this passage from Dr. Maxwell, ignoring the fact that what he said was, it's not that easy. That was his answer. It's not that easy. I'm not sure we had that opportunity at this time. And he spoke to this issue specifically in the quote I mentioned earlier, that there was a reason why they didn't use unpasteurized milk, and that's because of concerns about infection. You wouldn't want to give something to a vulnerable infant that might infect them with a disease that the mother might be conveying. There would be tremendous liability for the hospital if they did that. That's why they don't do it. And there's certainly no evidence in this record to support the inference that that decision would have been different if only something had been said on the label about the association between formula feeding and that. Mr. Koberle, can you go to that question that I was asking Mr. Rojas? You've been pretty clear that the plaintiff bears the burden of showing that they would have changed their behavior. What, if any, burden does the plaintiff bear with respect to coming forward with a particular warning? I think it's embedded in the jury instruction, Your Honor. The whole jury instruction is based on the idea that the plaintiff has to, quote, that, quote, the warning suggested by her, close quote, would have led to changed behavior that would have avoided the injury. And you referenced the passage in Judge Pallmeyer's opinion where she talks about Dr. Scheer's proposal. Is that the only alternative warning, proposed warning, that is in the record in the case? Did the plaintiff come forward with anything else? The plaintiff didn't come forward in discovery with anything else, and we asked multiple times. But that's the only warning that was identified in discovery, and it matters that it was in discovery because a plaintiff can't take a case to trial by positing that some warning that they just made up should have been given. They have to show that it's based in science in some way. And that warning would have been that, quote, human milk has a lower risk of neck than formula, end quote. Correct, and that is exactly what Dr. Maxwell testified that he knew. I also want to, speaking of West Virginia law, Your Honor, West Virginia does not have what's sometimes called the heating presumption, which is a presumption that if a warning was given, people would have heated it. It's a rebuttable presumption. We've cited the Mousachuk case for that proposition. Also, the very burden that is stated by the jury instructions is inconsistent with any idea that we assume that a warning would have made a difference. And if you look at the Howard v. Eaton case, Your Honor, which is a West Virginia Supreme Court case, it makes clear that summary judgment is required when there is no evidence that the plaintiff would have heated or read additional warnings. So the plaintiff does have the burden to come forward with evidence that they would have heated or read the warnings. And here, of course, both the mother and the father conceded that they did not see the labels or the packaging, so they could not have read any additional warnings. I see my time is finished. If there are no further questions. Thank you very much, Ms. Coberley. Thank you. Mr. Rojas, we'll move back to you now for a rebuttal argument. Your Honors, I think there are five points I'd like to make. First of all, in response to something that I heard, to be clear, there are two experts in this case, Dr. Supra and Dr. Spector, who have specifically concluded that formula clauses NAC. So just one correction there. I think for purposes of what we're dealing with today, that has to be presumed as true. They both survived Daubert. One thing that Abbott is clearly trying to do is freeze time in 2014, but the reality of it is that, as I mentioned earlier, they've known that formula significantly increases the risk of harm of necrotizing enterocolitis for at least 50 years. And so the idea that this discussion about Dr. Maxwell, it would have taken them five years, that warning should have been given 50 years ago when they knew. So the amount of time that it took for him to establish the donor program, I don't think begins at the time of Rayleigh's birth, but rather it begins at the time that they were under a duty to give a warning. And I would respectfully submit that the time to give a warning is the time where they become reasonably aware of the risk. That's the time to tell doctors. That's the time to tell consumers. On the pasteurization question of milk, it is true. I'm not aware of anything at this hospital that would have allowed pasteurization there. The question here is one of risk and benefit. The risk of formula, if we accept as true as we must, that it increases the risk of harm significantly. The question becomes weighing that against the risk of unpasteurized milk. The problem is that neither the physician nor the mother were aware of the extent of the risk, and I think that's clear from the record. Or at least I believe there's a genuine question of fact on that issue. There is a false binary here that has been advanced, and that I think that by Abbott and that to a certain extent the district court adopted, which is that the options are donor milk or human milk. And there's a series of other options with a proper warning that were possible. There could have been a continuation of TPN, intravenous nutrition. So this baby could have been fed for a period of time with neither donor milk or human milk. Does the record say how long that could be? Because there was intravenous feeding. There was at the beginning, Your Honor, and the record does not say how long it can be for. That's not in the record, to my knowledge. But we can establish from the record that it is possible. I think at the beginning the baby was fed intravenously for maybe three or four days. I apologize, I don't know the exact amount. It's also possible to stop feeding altogether. And so these decisions that would have to be made with the mother, if she knew of the full extent of the risk of formula, if the doctor knew of the extent of the risk of the formula, there were other options as well, which is maybe to allow a break, to give nutrition to the baby. I see I'm out of time. I do want to say one final point, though. There is no law, to my knowledge, under West Virginia law, suggesting that a specific warning must be advanced at the summary judgment stage. I don't even think there's anything saying that it has to be specifically provided to the jury. So on that I'll rest. Thank you, Your Honors, for your time today. Thank you, Mr. Rojas. Thank you, Ms. Corberley. The case will be taken under advisement.